Bennie NOWLIN, Appellee,

v.

Mary Lois NOWLIN, now Ridenour,
Appellant,

Floyd Nowlin and Ada Nowlin,
Intervenors.

No. 48371.

Court of Appeals of Oklahoma,
Division 2.

June 8, 1976.

Released for Publication by Order of Court
of Appeals July 1, 1976.

Reid K. Mayfield, Atoka, for appellant.

Payne, Stubblefield & Stubblefield, Atoka, for intervenors.

BRIGHTMIRE, Justice.

In January 1967 Bennie Nowlin asked for and got a divorce from Mary Lois Nowlin and legal custody of their four children then ranging in age from one to eight years. Circumstances forced the children to be left with their paternal grandparents—the Floyd Nowlins—who for eight years raised them well. Then on February 24, 1975 Mary Nowlin, now Ridenour, filed a motion to modify the child custody provisions of the decree. Following a hearing on the motion on March 25, 1975, the trial court denied the motion. The 37-year-old natural mother appeals complaining that the trial court erred in: (1) denying her motion when plaintiff failed to appear and oppose it and (2) "granting affirmative relief to third per-

sons not parties to the action . . . . ."
We affirm.

The reason why Bennie sought a divorce in the first place was because the mother, instead of taking care of her four children, fell into the habit of "going out and staying out all night or until real late" then sleeping all day, requiring Bennie to call upon his parents for child-care help. It was for this same reason that the court placed legal custody of the children in their father.

Between that time and February 24, 1975, when defendant filed her motion to modify, the record contains no great detail about her life. It does show, however, that she twice remarried. The first time was to a man named Barker who sired her fifth child. This marriage was "annulled out in California." The second marriage ended when, after living with her for a while, the man died. Mary testified that after being divorced from Bennie she lived several places, got married once in Las Vegas, worked a little while part-time in a cafe, and before that worked some as a nurse's aide. At the time of filing the motion in question she and her six-year-old son by Barker were occupying an apartment in Wilburton, Oklahoma, living on $180 a month the source of which was $30 from the cafe work and $150 from the welfare department. When questioned about whether she could take care of four more children on that income she said, "Well if the welfare is helping them now, why couldn't they help me then?"

"Do you [defendant] have any disease or any infirmity that would prevent you from working [full time]?" asked counsel.

"None whatever," she frankly admitted.

Defendant's interest in the children is revealed by her testimony that for three years she did not visit them at all and since then she has seen them only once in a while. During a visit a few days before the hearing she took 17-year-old Tammy, the oldest child, aside for a talk. Said Tammy, "She told me she wanted us [the four children] to go with her and that she would get a big four bedroom house and just stuff like that . . . ." But, continued Tammy, "I told her that even if she did I would not go with her." A little later the grandmother came into the room and found Tammy crying. According to the grandparent, "they were all just really upset and Mary used some really bad language," prompting Tammy to say, "I thought you were a Christian." Responded Mary, "Well Jehovah Witnesses are people just the same as anybody else."

The children seemed to have developed well under the care of the grandparents for eight years. The couple, though 68 years of age, are still in good health and physically able to provide for the children's needs. Moreover, they have become attached to the young ones and wish to continue caring for them.

In reading the record one gets the same impression that the trial judge must have received from listening to the live testimony and that is that the natural mother in abandoning the children eight years ago demonstrated a love for them that was perhaps something less than boundless and that her current interest in them arises from a concern for welfare but not necessarily that of the children.

▉▉▉▉ For us to sustain defendant's first proposition—in effect that the court was obliged to sustain her motion because plaintiff did not show up and resist it— would require the abandonment of certain relevant fundamental principles. That is, we would have to ignore the fact that the trial court's paramount legal concern is to promote the children's general welfare. *Childers v. Childers,* 202 Okl. 409, 214 P.2d 722 (1950). Regardless of who does or does not appear, the trial court is without authority to modify a child custody order unless it be proved to its satisfaction that: (1) a substantial and material change of condition has occurred since its entrance, and (2) a custodial change would markedly advance the welfare of the ward. *Walker v. Walker,* Okl., 460 P.2d 900 (1969).

■ The most defendant has attempted to prove here is that she has decided to settle down in Wilburton and involve herself with a religious organization. The implication is that she has stopped running around at night and is willing to devote substantial time and attention to her children whom she alleged in her motion she "loves." While this, to be sure, is a change of conditions it falls short of being a material one. Moreover, defendant has also failed to show how being in her custody would improve the children's lot.

We can hardly keep from wondering about the sincerity of her profession of love when she seems willing to remove the children against their will from the only home most of them can remember having —the same one they had when the divorce was granted. Through the years it has been a home that, though lacking in material things, has not been deficient in achieving for the children genuine affection, self-respect, kindness, and desirable behavioral patterns. At the hearing the children recognized and appreciated the advantages they had and to a child—now ranging in age from 9 to 17—opposed leaving such an environment and chancing their well-being with a woman who to them was little more than a stranger, a woman who was mother in fact but not in effect. The trial judge wisely declined to separate the youngsters from their established and adequate surroundings.

■ Nor does defendant's second contention—that relief was erroneously granted the children's grandparents because they were not parties to the lawsuit—have merit. As we view the matter, the trial judge did not grant the grandparents any relief, "affirmative" or otherwise. All he did was deny defendant's motion to change legal custody from the father to her. The fact that the legal custodian was working in Texas and not living with the children at the time of the hearing was not really of crucial significance under the circumstances presented. The more important inquiry was whether, during his absence, he made adequate arrangements for their care and maintenance. Of course, it was undisputed he did by entrusting them to his parents. This is not the first time grandparents have been found to be more suitable guardians of little ones than the natural mother. *Bowring v. Bowring,* 196 Okl. 520, 166 P.2d 415 (1946). Nor, we dare say, will it be the last.

Affirmed.

BACON, P. J., and NEPTUNE, J., concur.